A02A1145. HUNTER et al. v. WERNER COMPANY.
(574 SE2d 426)

RUFFIN, Presiding Judge.

Dale Hunter sued Werner Company ("Werner"), alleging that he was injured when a Werner-manufactured fiberglass ladder he was climbing suddenly broke, hurling him to the ground. Hunter asserted claims for strict liability, negligent design, and failure to warn.[1] The trial court awarded summary judgment to Werner on all claims, and Hunter appeals.[2] Hunter argues that the evidence was sufficient to show material issues of fact remained on his claim for failure to warn, and that the trial court abused its discretion when it refused to consider a late-filed affidavit in ruling on Werner's motion for summary judgment. For reasons that follow, we reverse.

On appeal from a grant of summary judgment we view the evidence and the inferences drawn from it in the light most favorable to the nonmoving party.[3] A defendant is entitled to summary judgment if the record shows a lack of evidence sufficient to create a jury issue on at least one essential element of the plaintiff's case.[4] The defendant does not need to affirmatively disprove the plaintiff's case, but may prevail by pointing to the lack of evidence.[5] If the defendant does so, the plaintiff cannot rest on his pleadings, but must point to specific evidence that gives rise to a triable issue of fact.[6] Our review is de novo.[7]

When viewed in a light most favorable to Hunter, the evidence shows that the fiberglass ladder at issue snapped suddenly without warning, causing Hunter to flip backward and fall to the ground, injuring himself. Hunter had climbed the ladder once earlier that morning, and his two helpers had climbed it two or three times. Hunter testified that when he climbed the ladder again and was "just about to the top, [he] heard kind of a crack, about like a rifle, a little twenty-two caliber, you know, pop, and the next thing [he knew] . . .

[1] His wife, Karen Hunter, asserted a loss of consortium claim. Dale Hunter and Karen Hunter may be referred to collectively as Hunter.
[2] The trial court found that Hunter's claims for strict liability and negligent design were time-barred. Hunter does not challenge this conclusion.
[3] See *Jackson v. Ford*, 252 Ga. App. 304 (1) (555 SE2d 143) (2001).
[4] See *Traicoff v. Withers*, 247 Ga. App. 428 (544 SE2d 177) (2000).
[5] See id.
[6] See id.
[7] See *Pyle v. City of Cedartown*, 240 Ga. App. 445, 446 (524 SE2d 7) (1999).

everything was flashing in front of [him] and [he] was on a down dive . . . to the ground."

Hunter's occupation involved commercial roofing. When the ladder broke, he was repairing a roof at a shopping center. Hunter said that he used this particular ladder only about 15 or 20 times per year. The ladder was manufactured in April 1978 and broke on March 21, 1996, or nearly 18 years after it was manufactured.

The record includes the testimony of Robert A. Collins, a 25-year employee of Werner and an engineer familiar with ladder design. After examining the broken ladder, Collins described the ladder as having suffered a "sudden impact" fracture. Collins testified, "the nature of the actual break is such that it exhibits evidence of having occurred very quickly. In other words, it shows no evidence of building up over time or something. It shows no evidence of a prior crack perhaps or something like that. In other words, it looks like a clean, rapid fracture." In Collins's opinion, if only one side rail had broken, the ladder could still have supported Hunter. But Collins felt that both side rails had fractured virtually simultaneously. Collins testified that he "saw no evidence of any kinds of cracking" or "[p]reexisting cracking" where the fractures occurred. Collins also testified that he found no evidence of any obvious, prior damage to the ladder and only saw "some minor wear marks."

The record also includes the affidavit and deposition of Harold W. Stillman, a licensed professional engineer and structural engineer with extensive experience in ladder-related engineering. Stillman averred that he was familiar with Werner's technical manual on fiberglass ladders as well as with "the particular ladder design involved in this case." Stillman attested, "[i]t is significant that plaintiff heard a loud 'crack' at the time he fell, since this testimony in conjunction with a review of the damaged area of the ladder indicates actual structural failure in the fiberglass. . . ." Stillman testified that "[f]iberglass ladders can become structurally damaged over time due to normal and foreseeable usage." He testified that Werner knew that fiberglass ladders have a propensity "to weather and deteriorate over time, especially in warm and moist climates where high humidity and high ultraviolet radiation (U.V.) exist."

Stillman further testified:

> Defendant Werner Co. has published a technical manual that acknowledges that fiberglass ladders must be handled and maintained with greater care than wooden or aluminum ladders, that one should avoid dropping fiberglass ladders, and that they should be transported in a vehicle with brackets designed for fiberglass ladders. Defendant is also aware that structural damage in this particular fiberglass ladder

may not have been readily visible to the untrained layperson. The labels on this particular ladder do not warn of these dangers.

Stillman deposed that the ladder showed numerous indentations in the rails which were the result of vibration in transit, and he affirmed that the ladder had been transported on a metal ladder rack. In Stillman's professional opinion, Werner's failure to warn was the likely cause of Hunter's injuries.

Werner moved for summary judgment arguing that its failure to warn was not the proximate cause of Hunter's injuries. Werner also maintained that Hunter failed to establish that the company knew that the ladder was dangerous. The trial court ruled in favor of Werner on Hunter's failure to warn claim, determining that there was no evidence "that Defendant Werner had prior actual or constructive knowledge of any danger that could be caused by the manner in which a fiberglass ladder is *transported*."[8]

1. Hunter claims the trial court erred in refusing to grant his motion to supplement his response to Werner's motion for summary judgment. We agree.

The record shows that in its discovery request, Hunter asked for "[a]ll of defendant's technical manuals and documents that discuss or refer to fiberglass." Werner eventually produced a technical manual which was copyrighted in 1997. On May 18, 2001, the trial court heard oral argument on Werner's motion for summary judgment. According to Hunter, at the hearing on the motion, "Werner's counsel claimed, for the first time, that the publication date of the technical manual in evidence (1997) did not prove Werner had prior knowledge . . . since the injury occurred in 1996." On May 23, 2001, Hunter filed a motion to supplement his response to Werner's motion for summary judgment. Attached to the motion was a supplemental affidavit of Hunter's expert, Stillman, who testified that he was familiar with Werner's "Fiberglass Ladder Technical Manual," copyrighted 1997, and an earlier manual copyrighted 1976-1995. He further affirmed that "[t]he 1997 manual and the 1976-95 manuals are the same regarding [Werner's] statements and advisements that fiberglass ladders must be transported in a particular manner on special ladder racks in order to avoid excessive damage due to road shock and vibration."

Hunter argues that Werner abused the discovery process by failing to deliver the manual copyrighted 1976-1995, and that, given the abuse, the trial court should have considered Stillman's supplemen-

---

[8] (Emphasis in original.)

tal affidavit, even though it was untimely filed for purposes of OCGA § 9-11-56 (c). Werner responds that it did not abuse the discovery process. Werner points out that Hunter knew the copyright date of the 1997 manual, but continued to rely on it for establishing Werner's knowledge of a duty to warn before the 1996 incident. Werner acknowledges that it was served with a request to produce all "documents that discuss or refer to fiberglass," but argues that it objected to the request on the grounds that it was overly broad, vague, and not reasonably calculated to lead to the discovery of admissible evidence. Furthermore, Werner argues, Hunter never moved the trial court to compel Werner to provide additional documents, and Hunter had sufficient time to file Stillman's supplemental affidavit. There is no evidence, Werner contends, that the information contained in Stillman's supplemental affidavit only came to light after the date of the hearing.

Hunter maintains — and Werner does not dispute — that attorneys for Werner first contended at oral argument on the motion for summary judgment that the 1997 manual was copyrighted too late to be evidence of Werner's knowledge at the time of the 1996 injury. Indeed, in its brief in support of summary judgment, which was filed long before oral argument, Werner does not mention the copyright date, which is written in fine type on the back page of the manual. Hunter argues that attorneys for Werner essentially manipulated the procedural rules by withholding the pre-1997 manual and then basing an argument on the absence of such a manual after it was too late to supplement the record. We agree that Hunter was unfairly prejudiced by Werner's conduct.

OCGA § 9-11-56 (c) allows the party opposing a motion for summary judgment to file opposing affidavits before the day of the hearing on the motion. However, "[i]t is well settled that the trial court has the discretion to decide whether it will consider affidavits not served within the time limits contemplated by the statutes."[9] Such discretion is consistent with the Civil Practice Act's intent "to promote [justice] and not to obstruct the administration of justice."[10] Here, the trial court's failure to consider the late-filed affidavit undermines this intent. We are unaware of any case in which we have affirmed the trial court's refusal to consider a late-filed affidavit that was necessitated by the moving party's failure to respond candidly to discovery. In this case, there would have been no need for the supplemental affidavit if Werner had previously produced the 1976-

---

[9] (Citations and punctuation omitted.) *Zampatti v. Tradebank Intl. Franchising Corp.*, 235 Ga. App. 333, 338 (2) (b) (508 SE2d 750) (1998).

[10] *Herringdine v. Nalley Equip. Leasing*, 238 Ga. App. 210 (1) (517 SE2d 571) (1999) (physical precedent only) (involving the liberal construction of pleadings).

1995 manual. In sum, the trial court's ruling rewards Werner for what appears to be its failure to adhere to the discovery rules.

We are not convinced otherwise by the authority cited by Werner. In *Nall v. Bill Heard Chevrolet Co.*[11] and *Mayomi v. Portman Properties*,[12] it was clear that the affidavits were not timely filed because of some oversight or delay on the part of the filing party independent from any action by the opposing party. Again, "the courts of this state, both trial and appellate, should be diligent to hew not only to the letter of the [Civil Practice Act], but also to [its] spirit."[13] It is also preferable to de-emphasize "form and technicality in order that the substantive rights of litigants may be asserted and tried on the merits."[14] Under these circumstances, we find the trial court abused its discretion in refusing to consider Stillman's supplemental affidavit.

2. Hunter next contends that material issues of fact remain for jury resolution on the issue of whether Werner breached a duty to warn. Again, we agree.

As a general rule, tort claims against a manufacturer are barred by OCGA § 51-1-11 (b) (2) "after ten years from the date of the first sale for use or consumption of the personal property causing or otherwise bringing about the injury." Under OCGA § 51-1-11 (c), however, the legislature crafted an exception to the ten-year limit: "Nothing contained in this subsection shall relieve a manufacturer from the duty to warn of a danger arising from use of a product once that danger becomes known to the manufacturer." A negligent failure to warn claim may arise "from a manufacturer's post-sale knowledge acquired months, years, or even decades after the date of the first sale of the product."[15]

> In failure to warn cases, the duty to warn arises whenever the manufacturer knows or reasonably should know of the danger arising from the use of its product. An actual or constructive knowledge requirement is consonant with Georgia tort law in general . . . and is in accord with the position taken by foreign jurisdictions and legal treatises.[16]

In refusing to relieve a manufacturer from the duty to warn about subsequently discovered defects, the legislature recognized "the possibility that this duty may not emerge until long after the

---

[11] 238 Ga. App. 365, 366-367 (518 SE2d 164) (1999).

[12] 228 Ga. App. 848, 849 (493 SE2d 39) (1997).

[13] (Punctuation omitted.) *Ga. Power Co. v. O'Bryant*, 169 Ga. App. 491, 494 (313 SE2d 709) (1983).

[14] (Punctuation omitted.) Id. at 493.

[15] *Chrysler Corp. v. Batten*, 264 Ga. 723, 724 (1) (450 SE2d 208) (1994).

[16] (Citations omitted.) Id. at 724-725.

statute of repose has extinguished any cause of action arising out of the product's sale; that the duty to warn arises 'once the danger becomes known.' "[17] The rationale for the exception is that

> [t]he manufacturer is in the best position to either discover or learn of dangerous product defects and to determine how to correct such defects through remediation. The manufacturer has superior knowledge of such defects and the ability to find them, because notice of the defects comes to the manufacturer through product testing, quality control, product complaints, product liability suits, warranty suits, government-imposed recalls, and industry experience.[18]

Moreover,

> a duty to warn can arise even if a product is not defective. A product is not in a defective condition when it is safe for normal handling and consumption. If the injury results from abnormal handling, the seller is not liable. Where, however, [the seller] has reason to anticipate that danger may result from a particular use, [the seller] may be required to give adequate warning of the danger, and a product sold without such warning is in a defective condition.[19]

"Whether a duty to warn exists thus depends upon foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger. Such matters generally are not susceptible to summary adjudication and should be resolved by a trial in the ordinary manner."[20]

To avoid summary judgment, Hunter had to point to some evidence that Werner had a duty to warn about the dangers arising from the ladder's use or care because of its knowledge of possible structural failure in its fiberglass ladders. Stillman, Hunter's expert, testified that the internal structural damage to the ladder was not readily visible and that an untrained layperson would not likely have detected it. Stillman testified that the primary cause of the ladder failure was vibration damage or preexisting impact damage attributable to damage incurred while transporting the ladder. Stillman fur-

---

[17] (Punctuation omitted.) Id. at 727 (4).

[18] *Smith v. Ontario Sewing Machine Co.*, 249 Ga. App. 364, 368 (a) (548 SE2d 89) (2001) (physical precedent only), cert. granted, Case No. S01G1233 (February 4, 2002).

[19] (Citations and punctuation omitted.) *Battersby v. Boyer*, 241 Ga. App. 115, 117 (3) (526 SE2d 159) (1999).

[20] (Citations and punctuation omitted.) *Yaeger v. Stith Equip. Co.*, 177 Ga. App. 835, 836 (341 SE2d 492) (1986).

ther averred that the label for this ladder should have included information about the danger of failing to properly secure the ladder during transport.

Werner's own employee, Collins, admitted that improperly transporting a fiberglass ladder over a long period of time could cause "structural concern." The warning labels on the ladder did not caution about the danger of improper transport or advise about the use of special racks to transport fiberglass ladders.

The 1997 Werner technical manual, which Stillman affirms is materially the same as the 1976-1995 manual, shows that Werner knew that fiberglass ladders could be damaged if they were not properly transported. The manual provides:

> **Transporting.** Ladders transported on vehicles need to be properly supported. Overhang of the ladders beyond supporting points needs to be minimized. Contact points at supports need to be of a soft non-abrasive material, such as rubber or carpeting, to minimize the chafing and effects of road shock. Securing the ladder to each support point will minimize damage due to road shock and vibration.
>
> **Truck Racks.** Ladders need to be tied down to the truck rack in order to avoid chafing caused by relative horizontal and vertical motion of the ladder with respect to the truck rack, the truck, and the individual ladder sections. . . . Points of contact on all ladder racks and carriers shall incorporate a shock absorbing material where contact is intended to be made by design while supporting the ladder. . . . If these conditions are not satisfied, excessive wear will occur in the ladder, which will cause premature retirement of the ladder from service. Improperly designed and used truck racks will damage the side rails, the rungs, the feet, and other ladder parts due to vehicle vibration and road shock.[21]

Although Werner argues that the technical manual does not warn of injury or danger to persons by reason of improper transportation of fiberglass ladders, the manual can be reasonably seen as establishing safety standards, and not just standards for ladder maintenance, and the manual clearly warns of damage and deterioration to the ladder, including the side rails, if it is not properly transported.

---

[21] These portions of the 1997 Werner manual are abstracted sections of the "ANSI A14.5 Fiberglass Ladder Standards." ANSI A14 is the "American National Standards Committee on Safety in the Construction, Care, and Use of Ladders," and ANSI A14.5 are the standards on portable reinforced plastic ladders.

Other evidence showed that, before 1996, Werner knew about three other claims of injury from fiberglass ladders and had identified three such cases in responding to interrogatories. Collins admitted that these pre-1996 cases involved allegations of "side rail fracture."

Hunter testified, without contradiction, that he was never warned by label or otherwise that his fiberglass ladder "must be handled and maintained with greater care than wooden or aluminum ladders," that his ladder could be damaged by dropping it, that it needed to be transported in a vehicle with special brackets, or that damage to the fiberglass might not be readily visible to a layperson. He also testified that he read the labels on all his ladders as a matter of custom. Hunter further testified that he never received any recall notice or warning after he purchased the ladder.

We conclude the evidence is sufficient to create an issue of fact as to whether Hunter's ladder failed because of damage suffered through improper transportation, which would not have been readily visible to Hunter. The record also contains evidence showing that Werner knew, before Hunter was injured, that fiberglass ladders require special handling and need to be tightly secured in cushioned truck racks to avoid damage to the ladder. Because there is no evidence showing that Werner warned, notified, or attempted to notify Hunter about this information, we conclude that a jury must determine whether Werner breached a duty to warn Hunter about the danger of structural failure to the ladder.[22]

*Judgment reversed. Barnes, J., and Pope, Senior Appellate Judge, concur.*

DECIDED NOVEMBER 15, 2002 ▇

W. McCall Calhoun, Jr., for appellants.
*Swift, Currie, McGhee & Hiers, Mary D. Owens, Terry O. Brantley,* for appellee.

---

[22] See *Ogletree v. Navistar Intl. Transp. Corp.*, 271 Ga. 644, 647 (522 SE2d 467) (1999) (the right to draw an inference of negligence lies peculiarly within the exclusive province of the jury).